CORNELIUS STEWARD AND SAMUEL METLER v. JAMES SCUDDER.

1. Evidence of usage or custom in any particular business or trade is admissible to explain either a parol or written contract, but not to contradict the express terms of the contract. It may show that terms in any particular business or trade have acquired a meaning different from their ordinary acceptation, but for this the evidence must be plain and explicit.

2. Usage cannot be allowed to explain or limit a contract, unless it be certain, uniform, and notorious, so that it must have been known by the parties, and formed part of the contract.

3. When a grain factor is directed to sell for cash, evidence may be given of a custom on sales for cash, to allow the purchaser to receive the grain, and to call for the money in three or four days after delivery; but unless the evidence is that such custom is uniform, well established, and at the risk of the principal, it will not establish the usage so as to protect the factor.

This was an action brought by the plaintiffs to recover back the price of a quantity of corn, which had been sold by the plaintiffs, as factors of the defendant, the price of which they had paid to him before they had received it from the purchaser: the purchaser failed after the remittance, and the corn never was paid for. The plaintiffs had been directed to sell *for cash*, but offered evidence on the trial to prove that at New York, where they carried on their business as commission merchants, and where the corn was consigned to them and sold, there was a custom by which sales for cash were made upon a credit of *a few days*, and that this was the true and well understood meaning of a sale *for cash*. The evidence was allowed at the trial, but the witnesses for the plaintiffs did not agree as to the length of credit given, nor in the fact that it was always given; there was contradictory evidence, on the part of the defendant, as to the existence of the custom. The circuit judge charged the jury, that although the directions were to sell for cash, yet that if it was proved that by the custom of merchants, a sale for cash meant a sale on a credit of three or four days, the plaintiffs could not be liable to the defendant for negligence; but that to establish such a custom it was necessary to prove that it was uniform, and that the plaintiffs having paid over the money would make no dif-

ference; if they could have prevented the defendant from recovering the price they could recover the money back.

A verdict was rendered for the defendant, and the question came up on the argument of a rule to show cause why the verdict should not be set aside, and a new trial granted.

The rule was argued before the CHIEF JUSTICE and Justices ELMER and POTTS, by *Vroom*, for plaintiffs, and *Hagerman* and *Dayton*, for defendant.

*Vroom*, in support of rule.

The questions in this case are, whether this was a legal custom, and whether it was sufficiently proved before the jury.

The custom was reasonable and legal, and it had been sanctioned, and the court charged that it was a good custom.

The only question then was, had the custom been proved. The evidence for the plaintiffs was clear and explicit, and on the part of the defendant there was no evidence to contradict or vary it. The question was rightly submitted to the jury, but their verdict was clearly against the evidence, and should therefore be set aside.

The payment of the money does not change the rule or affect the case; it was sent at the defendant's special request, and for his accommodation. *Story on Agency* 241, § 202; *Paley on Agency* 27, 28, and notes; 2 *Kent's Com.* 632; 1 *Livermore* 127; 1 *Pick.* 343, *Clark* v. *Vanorthwick;* 1 *Cowen* 616, *Leverick* v. *Meigs;* 1 *Gal.* 360, *Bunnell* v. *Phillips;* 5 *Cowen* 473, *Robertson* v. *Livingston.*

The error of the jury was in holding that countrymen were not bound by city customs.

*Hagerman*, against the rule.

1. We deny the existence of the custom, and if this court review the evidence, nothing will be found there from which the jury could have found the existence of such a custom.

2. If the custom was proved to exist in fact, still it is an illegal custom. *Smith's Mer. Law* 105–6; 5 *Taunt.* 749, *Lefevre* v. *Lloyd;* 3 *Camp.* 291, *Larrison* v. *Swan;* 7 *Taunt.*

159; 5 *Term R.* 252, *Bliss* v. *Arnold; Reeves' Dom. Rel.* 349.

3. If payment was without fraud, or mistake of existing facts, it was legal, and plaintiffs are concluded. 4 *Cowen* 250, *Oakley* v. *Crenshaw;* 3 *Johns. Ch.* 600.

*Dayton,* on the same side.

If this custom exists, it must be coëxtensive with the business of the city of New York.

The real question is, does a *sale for cash* mean a sale on a *credit of a week.*

The proof in this case fails in every requisite to constitute a good custom.

1. It is unreasonable (4 *B. & Ald.* 210); it is an attempt to prove that *cash* means its contrary, *credit.*

2. It is not certain.

One witness says the custom is to give three or four days; another three, four, or five days; a third three days to a week, and another three to ten days. Two pence in lieu of tithes good, two *or* three pence bad. *Bl. Com.*

It is uncertain not only as to time but as to persons, only if purchaser in good credit.

3. It is not *compulsory,* which is necessary to a good custom.

4. It is not consistent.

But in this case the overwhelming weight of evidence is that no such custom exists.

Again, the question is settled by the payment of the money; it was not an advance upon the corn, but a payment of the full price. 3 *John. Ch.* 600; 3 *Camp.* 292; 4 *Phil. Ev.* 185 and notes.

ELMER, J. The plaintiffs, who are commission merchants in the city of New York, sold a parcel of corn for the defendant, and advanced the money. They sold for cash, without any special instructions, at the usual charge for commissions in such cases, of one cent a bushel. The sale was made on Tuesday, the second day of April, the corn being then on

board the vessel in which the defendant, whose residence is in Princeton, New Jersey, had sent it to New York, he being himself in the city at the time, and informed who was the purchaser. He left town on the next day, and, on Thursday, the fourth of April, plaintiffs sent to him by mail the measurer's bill, bearing date the second, and an account of sales, bearing date the fourth. The account states the sale to have been made, on the second, to D. D. Conover, for $747.72, and from this sum is deducted the charges, amounting to $47.06, leaving a balance of net proceeds amounting to $700.66, for which amount they sent their check, on one of the banks in New York, payable to the order of defendant, 'which was endorsed by him, and afterwards paid. The money was thus sent, as was stated by the plaintiffs' clerk, at the special request of the defendant, who said he had use for it, and wanted it by the fifth. No intimation was made to him, when he made the request, before leaving town, or when the check was sent, that the payment of the money was at his risk, or that he might be called on in any contingency to refund it.

At the time of the sale to Conover, it appears he was in good credit. Plaintiffs' clerk called for the money on Friday, the fifth, and again on Saturday, but he was not to be found, and on Monday it became known that he had failed. No part of the money was ever paid to the plaintiffs. Some time during the week succeeding Conover's failure, plaintiffs apprized the defendant, by letter, of the fact that they had not received the money, and called upon him to refund it. To this defendant replied, by a letter dated the thirteenth, declining so to do, and thereupon this suit was brought to recover back the money advanced.

It was alleged, on the part of the plaintiffs, that by the custom of trade in New York, when a sale is made for cash, the purchaser has three or four days in which to pay the money; and that, as upon such sales the commission merchant does not guarantee, the risk of payment remains upon the owner. The question was submitted to the jury, by the judge who tried the cause, whether such a custom was established by the evidence; and they were instructed that if it was, and the

jury were satisfied that the plaintiffs had acted in accordance with the common usage, and in the absence of specific instructions had been guilty of no negligence in transacting the business intrusted to them, they were entitled to recover. The verdict was for the defendant. No exception was taken to the charge of the judge; but, upon the coming in of the *postea*, a rule was obtained to show cause why the verdict should not be set aside as contrary to the evidence, and the question now is, whether, for that reason, there ought to be a new trial.

That the usage of trade may be given in evidence to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts, is well settled. But such a usage, to be available, must be established, known, certain, uniform, reasonable, and not contrary to law. 2 *Greenl. Ev.* § 251.

In the case of *Clark* v. *Van Northwick*, 1 *Pick.* 343, the same usage which was set up in this case was established and sanctioned by the court. The purchaser in that case paid a party the money, and became deranged the next day; and the court thought, that under the circumstances, the seller was not bound to follow and reclaim the goods, and decided that the loss must fall on the owner. In the case of *Bliss* v. *Arnold*, 8 *Vermont R.* 252, the Supreme Court of Vermont held the same usage to be unreasonable and illegal.

The evidence produced on the trial of the usage set up by the plaintiffs in the case now before us was certainly not very definite. The clerk says, " it is customary to render the bill, and then wait three or four days; on cash sales, money is considered payable in three or four days. It is the custom of commission merchants to allow three, four, or five days before calling for the money." Mr. Nevius, another witness, who had been in the business in New York forty years and upwards, says, " as far as my experience goes, cash sales embrace from three to seven days, and such is the custom there. Articles vary a little; wheat and corn average three or four days; flour seven or eight,—seven at the least." On the part of the defendant, several witnesses who were examined testi-

fied that they had never heard of the usage; and those who had, generally agreed in saying that they always understood that the risk of the delay was upon the commission merchant. It appeared that in two cases where losses had happened by the failure of purchasers, there had been a dispute about the usage, and the matter was compromised. No instance was shown in which the loss had been borne wholly by the owner.

In the case of the schooner Reeside (2 *Sumner* 567), Justice Story remarks, with great force and pertinency: "I own myself no friend to the almost indiscriminate habit of late years, of setting up particular usages or customs, in almost all kinds of business and trade, to control, vary, or annul the general liabilities of parties under the common law, as well as under the commercial law. It has long appeared to me that there is no small danger in admitting such loose and inconclusive usages and customs, often unknown to particular parties, and always liable to great misunderstandings and misinterpretings and abuses, to outweigh the well known and well settled principles of law. And I rejoice to find that of late years the courts of law, both in England and. in America, have been disposed to narrow the limits of the operation of such usages and customs, and to discountenance any further extension of them."

A case could hardly occur, it seems to me, better calculated to show the propriety of these remarks than the one before us. The defendant, a corn dealer residing in the country, sends his corn to a commission merchant in the great mart of trade, to be sold for cash. This he has a right to suppose the safest of all operations, and so that he finds a safe agent he thinks himself secure of his money. A sale for cash is a sale for the money in hand, at least such is the general meaning of the term. Upon such a sale the owner is not bound to deliver the goods until the price is paid. If the price cannot be ascertained until the goods are weighed or measured, ordinarily no property passes to the purchaser until that is done; and the lien of the seller on the goods for the price is extended so far as to entitle him, even after he has parted with the possession, and while the goods are *in transitu*, to retake them, on the

bankruptcy or insolvency of the purchaser, if the price be unpaid.

That the owner of goods who confides them to a factor to be sold for cash, must still look after and run the risk of the solvency of the purchaser for any length of time, longer or shorter, seems in opposition to the very idea of a sale for cash, the first principle of such a sale being, that the goods shall not become the property of the purchaser until he pays the money. A usage to control and reverse this principle, to make that cash which is not cash, but credit, if such a usage can be deemed reasonable and legal, ought to be well established by a custom so universal at the place where it prevails, and so precise and definite that the owner of the goods must be presumed to be fully aware of it.

The plaintiffs' witnesses state the usage in the case of sales of corn to be, that the commission merchant is to wait three, four, or five days before he asks the purchaser for the money. But whether this is merely at the option of the seller, and whether the purchaser has an absolute right to claim the delay, like the three days' grace allowed on a bill of exchange, they do not state. The defendant's witnesses, who were aware of the usage, considered it entirely optional with the seller, and dependent upon his confidence in the purchaser. Is the delay to be three, four, or five days? Evidently there is no precise time fixed. Again, is the usage adopted merely for the convenience of the factor, and at his risk? This is the vital question, and the evidence leaves it undecided. It is plain, from the conduct of the plaintiffs in this case and from all the evidence, that no settled understanding on this point has ever been come to by the commission houses themselves. In some cases where a loss has happened they have claimed to throw it on the owner, but it is not shown that any owner has ever acknowledged its justice. There is, then, no plain definite usage known to all parties, and by which all parties ought to be bound.

In the case of *Wood* v. *Wood* (1 *Car. & P.* 59), where a usage to send goods to be left for inspection a certain time before an answer was given, was set up, and some of the wit-

o

nesses spoke of three days, and others of a week, and one of a month, as the time, the judge declared that a usage to be binding must be uniform and universal, and that so uncertain a usage was not binding. In the case of *Sewall* v. *Corp* (1 *Car.* & *P.* 392), it was held that a usage of veterinary surgeons to charge for attendance when there was not much medicine required, was too uncertain. These were *nisi prius* decisions, but they were in accordance with the settled doctrines of the law, and such as ought to be adhered to.

On account of its inequality and its great liability to abuse, I strongly incline to the opinion that the usage set up, if it was fully established, ought to be held to be unreasonable, and therefore illegal. But waiving that question, as not necessary to be settled, I am clear in the opinion, that the evidence in the cause before us shows no such fixed, definite, and universal usage as ought to be held binding on the defendant, and to throw upon him the loss arising from the failure of Conover to pay for the corn he purchased from the plaintiffs, and that, consequently, the verdict was right, and ought not to be disturbed. This makes it unnecessary to consider whether the sending of the check was, under the circumstances, a payment, and not a mere advance. I think the rule to show cause must be discharged.

HAINES, J. James Scudder, the defendant, a merchant residing at Princeton, in this state, having a quantity of corn in the city of New York, employed the plaintiffs, who were commission merchants in that city, to sell it for him. He desired it to be sold for cash, declaring that he needed the money to make his first of April payments, and no other directions appear to have been given.

The plaintiffs, on the 2d April, 1850, sold the corn, for cash, to one David D. Conover, a commission and shipping merchant, then of good credit; and on the 4th April sent to the defendant their check for seven hundred dollars and six cents, being the net amount of the sale, after deducting freight, half the expenses of measurement, and commissions, at one cent per bushel. On Friday, the fifth of April, they demanded the

price of the corn twice at the counting house of Conover, and again, on Saturday the sixth, without receiving it.  At the last time, Conover was not to be found.  On Monday, the ninth, he had failed, and the money was never collected of him.

The plaintiffs then brought their action in this court to recover the amount of the money remitted by their check, as so much by them advanced on the sale ; and they insist that, by the custom of trade in the city of New York, the purchaser of corn for cash  has three or four days in which to pay the money, and that they, having sold the grain under the custom and in good faith, are not responsible for  the loss occasioned by the failure of Conover.

Mr. Justice Randolph, who tried the case at the Mercer circuit, charged the jury, that the law of New York, the place where the contract was made, must govern the case ; that a sale for cash ordinarily means payment of the purchase money immediately on the delivery of the goods ; and if such was the sale, an omission to demand the money until the fourth day after the sale was such negligence as would render the factors liable.   But if, by special custom of trade in New York, cash means payment in three or four days, then the not calling for the money until the fourth day was neither negligence nor violation of instructions ; that such custom would be legal, but that if it were not uniform it would not be good ; and if such custom was proved to the satisfaction of the jury, the plaintiffs were entitled to recover ; if not, that their verdict should be for the defendant.

The jury rendered a verdict for the defendant, and plaintiffs now move that the verdict be set aside, and a new trial granted.

Two questions are presented for our consideration.  *First.* Did the judge properly charge the jury in relation to the legality of a special custom.  And *secondly.*  Were the jury justified by the evidence in finding against the existence of such custom.

It has long been settled that a special custom will control a written contract, if it be not repugnant to its terms.   It does not alter or contradict the contract, but only limits or super-

adds a right which is consequential to the same, as where the custom in favor of taking the way going crop by a tenant is set up and maintained. *Wigglesworth & Dallison, Doug. R.* 201 ; *Vandoren et al.* v. *Everitt,* 2 *South. R.* 460. See, also, *The Society, &c.,* v. *Haight, Saxton's C. R.* 400, where the same principle is recognized.

But those general customs which form so important a part of the common law and the general custom of merchants, which may be said to prevail every where, are clearly to be distinguished from the particular usages of trade, which are applicable only to certain particular kinds of business, and sometimes only in certain particular places. The latter are to be understood as referring to a special usage, to be established by evidence, while the former are to be collected not from evidence *in pais,* but from deceptious legal principles and analogies which are presumed to be possessed by the court. 1 *Smith's Leading Cases* 307, in note to *Wigglesworth* v. *Dallison ; Edie et al.* v. *East India Co.,* 2 *Bur. R.* 1222.

The usage is said to be the key to the contract, without reference to which the intent of the parties could not be ascertained. *Smith on Contracts* 29, note *a ; The Queen* v. *Stoke upon Trent,* 5 *Q. B.* 303, (48 *E. C. L. R.*)

Evidence of it is admissible in explanation of any contract, whether written or parol. *Baker* v. *Ludlow,* 2 *John. C.* 289 ; *Coit et al.* v. *The Commercial Insurance Co.,* 7 *John. R.* 385 ; *Astor* v. *Insurance Co.,* 7 *Cow.* 202.

But it is not admissible where the meaning of the contract is clearly expressed and not doubtful. *Macomber* v. *Parker,* 13 *Pick. R.* 176 ; *Brown* v. *Brown,* 8 *Metcalf* 577 ; *Sleght* v. *Rhinelander,* 1 *John. R.* 192; nor where it will contradict a written contract; *Allen* v. *Dykers,* 3 *Hill (N. Y.) R.* 593 ; *Hinton* v. *Locke,* 5 *Ib.* 437 ; or the express terms of a parol agreement. It is competent to assist the interpretation of terms peculiar to a trade, or the sense attached to them. *Spicer* v. *Cooper,* 1 *Q. B.* 424 (41 *E. C. L. R.*); or the meaning of cant phrases ; *Evans* v. *Pratt,* 3 *Man. & Granger* 759 (42 *E. C. L. R.*)

But, to vary the ordinary meaning of plain words, the evi-

dence of usage must be clear and irresistible. *Lewis* v. *Marshall*, 8 *Scott N. R.* 846.

In *Anderson* v. *Pitcher*, 2 *B. & P.* 168, Lord Eldon expressed an opinion that the practice of admitting usage to explain contracts ought not to be extended. See, also, *Donell* v. *Columbian Insurance Co.*, 2 *Sumner's R.* 377.

It has also been said that usage will not be recognized in a court of law, unless it be reasonable and adapted to increase. trade and promote fair dealing. *Macy* v. *Ins. Co.*, 9 *Metc.* 363; *Bowen* v. *Stoddart*, 10 *Ib.* 381.

Usage cannot be proved by isolated instances, but must be so certain, uniform, and notorious that it must be presumed to have been understood by the parties as entering into and constituting a part of the contract. *Cope* v. *Dood*, 1 *Harris' R. (Pa.)* 33 ; . *Nichols* v. *De Wolf*, 1 *Rhode Isl. R.* 277.

It must also be mutual and compulsory, so that either party may avail himself of it.

Such being the well established rule of law, the court properly left it to the jury to determine, upon the evidence, whether such a custom did exist.

The remaining question is, whether the jury were justified by the facts in rendering a verdict against the plaintiffs.

William F. Metler, the clerk of the plaintiffs, testified it was usual to pay in three, four, or five days after receiving the bill of measurement ; that it is customary to deliver the corn, with the bill of measurement, to the purchaser, and give him the control of it, and then to wait three or four days to have the bill examined ; that it is not the practice to take a note or any thing to show for it during those three or four days, "*because we have perfect confidence in the purchaser's ability to pay when called upon.*" Sometimes they call in a day or two. To pay in four or five days is the business habit of the city.

Peter J. Morris, a commission merchant, testified that, as far as his experience went, cash sales embrace from three to seven days; wheat and corn three or four days, flour seven or eight. He further says, "If we buy any article from a countryman, and he says he must have the money to-morrow, if we buy we pay ; but in commission business, we usually

send (for the money) the third day. That is my custom and the custom of trade."

Abraham O. Voorhes, also a commission merchant of New York, said that when they make sales to houses of well known and established credit, they never call upon them under three or four days; but when to houses of not known responsibility, they call upon them the moment they can get the measurer's bill, and can make a true return. If they sell to houses that are safe they grant four or five days, if otherwise, collect the money immediately; and if there is any danger, apply to the custom house officers, and have the property locked up. The time of payment is extended as a courtesy to particular peo-' ple, but always demand the money, if there is any doubt, on delivery.

David Brister, a commission merchant of New York for one year, and a dealer in produce there for twenty-five years past, says he knows of no custom of allowing to purchasers three or four days before demanding the money.

Liscomb R. Titus, of Trenton, also a dealer in grain, says the usage of trade in New York and Philadelphia on a sale for cash is to receive the money on delivery.

Aaron Colby, a grain dealer of Kingston, says he knows of no custom of allowing three or four days to pay on sales for cash; he had heard of a courtesy to that effect, and on inquiry was informed that it was not at his risk.

This testimony did not satisfy the jury of the existence of the custom contended for, nor was it such as would authorize them to find a usage so certain, uniform, and notorious that it must be presumed to have been understood by the parties; nor such as would explain the ordinary meaning of the term *cash* to be a credit of three or four days; nor such as would excuse the plaintiffs for not calling for the money upon the delivery of the corn, and they were fully justified in declaring by their verdict that there was not sufficient proof of the existence of such custom.

The usage spoken of is rather a matter of courtesy than a rule of law, and there is nothing in it to prohibit a demand of the money on the delivery of the goods or the commencement

of a suit for the purchase money immediately on the refusal to pay.

The verdict, therefore, was not against the evidence nor the weight of evidence, nor the charge of the court against law, and the rule to show cause must be discharged.

The CHIEF JUSTICE concurred.

Rule discharged.